### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD E. RIGSBEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  1:24-cv-0644-JHE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION[1]

Plaintiff Richard E. Rigsbee ("Rigsbee") seeks review, pursuant to 42 U.S.C. §§ 405(g) and 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying his application for a period of disability and disability insurance benefits ("DIB").  (Doc. 1).  Rigsbee timely pursued and exhausted his administrative remedies.  This case is therefore ripe for review under 42 U.S.C. § 405(g). The undersigned has carefully considered the record and, for the reasons stated below, the Commissioner's decision is **AFFIRMED**.

### I. Factual and Procedural History

Rigsbee filed an application for a period of disability and DIB on April 28, 2021, alleging disability beginning on April 15, 2021.  (Tr. 216–221).  The Commissioner initially denied Rigsbee's claim (tr. 76), and Rigsbee requested a hearing before an ALJ (tr. 123–124).  After a February 22, 2023 hearing, the ALJ denied Rigsbee's claim on May 15, 2023.  (Tr. 23).  Rigsbee

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties in this case have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 10).

sought review with the Appeals Council, but it denied his request for review on March 19, 2024. (Tr. 5). On that date, the ALJ's decision became the final decision of the Commissioner. On May 22, 2024, Rigsbee initiated this action. (Doc. 1).

Rigsbee was 44 years old on his alleged onset date. (Tr. 36). Rigsbee has a high school education and past relevant work as a mail handler, machine operator, lawncare worker, and welder fitter. (Tr. 36).

## II. Standard of Review[2]

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this Court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This Court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*,

---

[2] In general, the legal standards applied are the same whether a claimant seeks supplemental security income ("SSI") or DIB. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

985 F.2d 528, 531 (11th Cir. 1993).  If the court finds an error in the ALJ's application of the law,

or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal

analysis has been conducted, it must reverse the ALJ's decision.  *Cornelius v. Sullivan*, 936 F.2d

1143, 1145–46 (11th Cir. 1991).

## III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of

disability, a claimant must be disabled as defined by the Social Security Act and the Regulations

promulgated thereunder.[3]  The Regulations define "disabled" as "the inability to do any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve (12) months."  20 C.F.R. § 404.1505(a).  To establish entitlement to

disability benefits, a claimant must provide evidence of a "physical or mental impairment" which

"must result from anatomical, physiological, or psychological abnormalities which can be shown

by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled.

20 C.F.R. § 404.1520(a)(4)(i-v).  The Commissioner must determine in sequence:

(1)    whether the claimant is currently employed;
(2)    whether the claimant has a severe impairment;
(3)    whether the claimant's impairment meets or equals an impairment listed
         by the [Commissioner];
(4)    whether the claimant can perform his or her past work; and
(5)    whether the claimant is capable of performing any work in the national
         economy.

---

[3] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of January 18, 2017.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to the formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562–63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job."  *Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The Commissioner must further show such work exists in the national economy in significant numbers. *Id.*

### IV. Findings of the Administrative Law Judge

After consideration of the entire record and application of the sequential evaluation process, the ALJ made the following findings:

At Step One, the ALJ found Rigsbee had not engaged in substantial gainful activity since April 15, 2021, his alleged onset date.  (Tr. 29).  At Step Two, the ALJ found Rigsbee has the following severe impairments: chronic obstructive pulmonary disease (COPD), panic disorder with agoraphobia, and reactive depression.  (Tr. 29).  At Step Three, the ALJ found Rigsbee does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 29).

Before proceeding to Step Four, the ALJ determined Rigsbee's residual functioning capacity ("RFC"), which is the most a claimant can do despite his impairments.  *See* 20 C.F.R. § 404.1545(a)(1).  The ALJ determined Rigsbee has the RFC to:

> lift or carry twenty pounds occasionally; and, with customary breaks, he can stand or walk six hours in an eight-hour workday, and he can sit six hours in an eight-hour workday. He occasionally can climb ramps and stairs, balance while walking, kneel, crawl, stoop, and crouch. The claimant should avoid all exposure to polluted environments or respiratory irritants. He can perform work

> with occasional interaction and cooperation with coworkers and supervisors; and he can maintain concentration, persistence, or pace to complete work in two-hour intervals for an eight hour day.

(Tr. 31). At Step Four, the ALJ determined Rigsbee could perform his past relevant work as a mail handler. (Tr. 29). Therefore, the ALJ did not proceed to Step Five. Instead, the ALJ found Rigsbee had not been under a disability and denied his claim.

## V. Analysis

Although the court may only reverse a finding of the Commissioner if it is not supported by substantial evidence or because improper legal standards were applied, "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Williams*, 615 F.2d 1103, 1106 (5th Cir. 1980)). The court, however, "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Rigsbee raises four objections to the Commissioner's decision: (1) the ALJ erred in substituting her interpretation of medical evidence for those of the medical experts and her reasons for not finding them persuasive is not supported by substantial evidence; (2) the ALJ failed to incorporate into the RFC the effects of Richard's severe panic disorder; (3) the appeals council erred when it denied review despite the receipt of additional evidence; (4) failure to give any weight, deference, or special consideration to opinions of Rigsbee's treating physicians conflict with the text, structure, history, and the purpose of 42 U.S.C. § 423(d)(5)(B) and the Social Security Act. Because the last argument informs what regulations matter to the analysis, the undersigned addresses it first.

**A. Rigsbee's Challenge to the Regulations Is Foreclosed by Binding Precedent**

Rigsbee contends that 20 C.F.R. § 404.1520c(a), which states that ALJ's are not required

to give any deference towards a claimant's treating physician, is an impermissible interpretation

of 42 U.S.C. § 423(d)(5)(B), a provision of the Social Security Act discussing treating physicians.

(Doc. 13 at 38–50).  That statute provides:

> In making any determination with respect to whether an individual is under a
> disability or continues to be under a disability, the Commissioner of Social Security
> shall consider all evidence available in such individual's case record, and shall
> develop a complete medical history of at least the preceding twelve months for any
> case in which a determination is made that the individual is not under a disability.
> In making any determination the Commissioner of Social Security shall make every
> reasonable effort to obtain from the individual's treating physician (or other treating
> health care provider) all medical evidence, including diagnostic tests, necessary in
> order to properly make such determination, prior to evaluating medical evidence
> obtained from any other source on a consultative basis.

42 U.S.C. § 423(d)(5)(B).  Rigsbee argues that the Supreme Court's recent decision in *Loper*

*Bright Enterprises v. Raimondo, Secretary of Commerce*, 603 U.S. 369 (2024) requires the court

to determine whether 20 C.F.R. § 404.1520c(a) is a correct interpretation of 42 U.S.C.

§ 423(d)(5)(B).  Under Rigsbee's view, the statute's specific reference to obtaining evidence from

the "treating physician" requires any regulatory interpretation to afford more weight to the treating

physician's opinion.  (Doc. 13 at 40–41).  Since the 2017 regulations eliminate deference to

treating physicians, Rigsbee argues that they cannot survive the court's analysis.

In *Loper Bright*, the Supreme Court overruled *Chevron, U.S.A., Inc. v. Natural Resources*

*Defense Council, Inc.*, 467 U.S. 837 (1984).  *Chevron* required courts to defer to reasonable agency

interpretations of ambiguous statutes.  *Loper Bright*, 603 U.S. at 379.  Under the rule announced

in *Loper Bright*, courts "must exercise their independent judgment in deciding whether an agency

has acted within its statutory authority . . . ."  *Id.* at 412.

Although Rigsbee spills a great deal of ink on his *Loper Bright* argument, this district court

is bound by the Eleventh Circuit's decision in *Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892

(11th Cir. 2022).  In *Harner*, the Eleventh Circuit upheld the 2017 regulations as a valid exercise

of regulatory power, within the scope of the Commissioner's delegated authority.  *Id.*  Rigsbee

notes that the Eleventh Circuit did so by using *Chevron* deference (doc. 13 at 39), but the *Loper*

*Bright* court explicitly stated that it did not "call into question prior cases that were decided by the

*Chevron* framework," 603 U.S. at 412.  Thus, *Loper Bright* did not abrogate *Harner*.  *See Del*

*Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022) (noting that to

abrogate an otherwise binding case to the extent that a court need not follow it, a decision of the

Supreme Court must "demolish and eviscerate each of its fundamental props") (cleaned up).  Since

*Harner* remains binding law, Rigsbee's argument is beside the point.[4]  *See Childress v. King*, No.

4:21-CV-237-CLS, 2025 WL 540092, at *5 (N.D. Ala. Feb. 18, 2025) (declining to conduct a

*Loper Bright* analysis in light of *Harner*).

### B. The ALJ Adequately Considered the Medical Evidence

Rigsbee argues that the ALJ substituted her interpretation of medical evidence for that of

medical experts and that her reasons for finding them unpersuasive are not supported by medical

evidence. (Doc. 13 at 21).  The two medical experts Rigsbee specifically refers to are treating

---

[4] The undersigned doubts that Rigsbee's argument is otherwise availing.  Section 423(d)(5)(B) provides no direction as to how evidence should be weighed.  The statute's reference to treating physicians perhaps indicates that it is important to review evidence from treating physicians, but it says nothing about whether the agency must defer to their opinions.  This is consistent with *Harner*, even on reassessment in light of *Loper Bright*.  *See Thomas v. Comm'r of Soc. Sec.*, No. 3:23-cv-1243, 2024 WL 4764465, at *3 n.9 (M.D. Fla. Nov. 13, 2024) (observing that *Harner* relied in part on the *Chevron* doctrine, but also that *Harner* "held that nothing in the Act specifies how treating-physician evidence is to be weighed or requires the treating-physician rule, which means the new regulations remain good law even with *Chevron* overruled").

pulmonologist Dr. Mohammed Shubair and Certified Registered Nurse Practitioner Angela Foster, who provided a consultative examination. (*Id.*)

For claims filed on or after March 27, 2017, such as this case, an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ is required to "articulate in [his or her] determination or decision how persuasive [he or she] find[s] all of the medical opinions," 20 C.F.R. § 404.1520c(b), taking into account five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including, but not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). In articulating an opinion's persuasiveness, the ALJ must explain how he or she considered the factors of supportability and consistency—the most important factors—and may (but is not required to) explain how he or she considered the other remaining factors. 20 C.F.R. § 404.1520c(b)(2).

### 1. Dr. Shubair

Dr. Shubair began treating Rigsbee on March 18, 2021. (Tr. 32). At this visit, Dr. Shubair noted Rigsbee had decreased breathing sounds, diminished air movements, and an oxygen saturation level at 95%. (Tr. 373–75). Thus, Dr. Shubair ordered a pulmonary function test. (Tr. 375). Dr. Shubair interpreted the results of the pulmonary function test as "normal spirometry with improvement since 2019" (when Rigsbee last had a pulmonary function test), "normal lung

volumes," and "mild impairment in the diffusion capacity." (Tr. 377). Dr. Shubair also ordered a

CT scan which showed extensive emphysema in the upper lung fields. (Tr. 489)

Dr. Shubair continued to treat Rigsbee for COPD and other ailments. Some of Rigsbee's

visits with Dr. Shubair resulted in abnormal examination findings; some did not. Rigsbee returned

to Dr. Shubair on July 15, 2021, reporting tightness in his chest and frequent COPD attacks. (Tr.

396). However, Rigsbee's lung sounds were clear and his oxygen saturation was 98%. (*Id.*). Dr.

Shubair prescribed a course of steroids. (*Id.*). Rigsbee also sought treatment on September 15,

2021, reporting that he had frequent COPD attacks, had to use a nebulizer an average of seven

times a week, and could not breath during panic attacks. (Tr. 391). This time, Rigsbee had

diminished air movement and decreased breath sounds. (*Id.*). Dr. Shubair administered a steroid,

prescribed and antibiotic, and prescribed Xanax for what he assessed to be a panic disorder. (Tr.

391–92). On January 26, 2022, Rigsbee followed up to refill medication. (Tr. 511). His lungs

were unlabored with good bilateral air movement and his oxygen saturation was 100%. (*Id.*). At

another appointment on June 23, 2022, Rigsbee had 97% oxygen saturation and clear lungs. (Tr.

546–47). Nevertheless, Dr. Shubair characterized Rigsbee's as "a candidate for long-term

disability based on his lung and his mental conditions." (Tr. 546).

Dr. Shubair provided two opinions to the ALJ. In a December 5, 2022, medical source

statement, Dr. Shubair opined that Rigsbee could stand for thirty minutes at a time, sit for two

hours, lift five pounds occasionally, tolerate dust, smoke, and fumes, that Rigsbee's COPD was

mild, and that Rigsbee could not tolerate work activities at any level of exertion. (Tr. 555–57).

The ALJ requested further clarification on Dr. Shubair's opinion given the fact that Rigsbee's

pulmonary function test was normal. (Tr. 33, 583). Dr. Shubair delivered his second opinion

through a letter dated March 8, 2023, in which he opined that "[p]atients with chronic obstructive

pulmonary disease/emphysema can present with severe symptoms that impair activities of daily living, even if their pulmonary function test is normal." (Tr. 583). Dr. Shubair stated that Rigsbee cannot work in environments with prolonged exposure to welding fumes. (*Id*.).

The ALJ found Dr. Shubair's opinions only partially persuasive. (Tr. 33). The ALJ agreed that Rigsbee could not work around welding fumes. (*Id.*). However, she found Dr. Shubair's opinion that Rigsbee could not tolerate work activities or lift more than five pounds occasionally was not consistent with Rigsbee's normal pulmonary function test and his normal breath sounds and generally good oxygen saturation levels when seen by Dr. Shubair and other providers. (*Id*.).

Substantial evidence supports the ALJ's decision to reject portions of Dr. Shubair's opinion. First, although Rigsbee claims otherwise, a pulmonary function test is objective evidence concerning pulmonary function. Rigsbee states that the pulmonary function test is not a good metric by which to judge his condition. (Doc. 13 at 21–22). Rigsbee's brief discusses the merits of relying on a pulmonary function spirometry test versus other types of tests to support complaints related to COPD.[5] (Doc. 13 at 21–24). And his reply faults the ALJ for failing to defer to a lung diffusion test showing "very low" testing results and instead relying on results from what Rigsbee

---

[5] Rigsbee states that "the SSA's own regulations concede that [spirometry] is not a good test for measuring the severity of emphysema." (Doc. 13 at 21) (citing 20 C.F.R. Part 404, Subpart P, Appendix I § 3.00(F)(1)). Rigsbee's citation is to the requirements for acceptable testing to establish disability under one of the listings for respiratory disorders. The cited provision states that diffusion level ("DLCO") "may be severely reduced in some disorders . . . such as . . . COPD (particularly emphysema), even when the results of spirometry are not significantly reduced." 20 C.F.R. § 404.00, Subpart P, Appendix 1 § 3.00(F)(1). It is unclear how the evidentiary standards for the listings apply here, where the question is simply whether the ALJ's decision is supported by substantial evidence—particularly where (1) the cited provision states that diffusion level "*may be severely reduced*" even when spirometry results differ and (2) the listings specifically contemplate that spirometry results may be used, *see* 20 C.F.R. § 404.00, Subpart P, Appendix 1 § 3.00(E)(1).

contends was "not an effective tool" to measure his limitations.[6] (Doc. 21 at 13–14). The ALJ's role is not to play doctor (*see* doc. 13 at 3), and neither is that the court's role. The question for the court on review is whether substantial evidence supports the ALJ's opinion; it is not to determine whether the ALJ appropriately relied on one metric versus another arguably conflicting and arguably better metric. There is no *legal* rationale given the standard of review for the undersigned to conclude that the ALJ's reliance on the pulmonary function test was misplaced.

In any case, though, the ALJ did not rely on the pulmonary function test alone. In addition to the test, the ALJ relied on the fact that during multiple hospital visits, Rigsbee had normal breath sounds. (Tr. 33–34). This included visits with Dr. Shubair. (Tr. 511, 513, 547 & 549–51). Rigsbee points to evidence in the record that supports that, on other visits, he had abnormal breath sounds. (Doc. 13 at 9–14, 25–26). But this does not undermine the ALJ's conclusion that Rigsbee "*generally* [had] normal breath sounds" (tr. 33) (emphasis added), particularly at visits with Dr. Shubair. While Rigsbee contends the ALJ cherrypicked normal examination findings to the exclusion of abnormal ones, this does not appear to be the case.[7] For example, Rigsbee

---

[6] Rigsbee cites a publication for the proposition that the 58% DLCO observed on the pulmonary function test falls into the moderate range (40%-60%) rather than the mild range (60%-75%). (Doc. 13 at 6) (citing Pranav Modi, *Diffusing Capacity of the Lungs for Carbon Monoxide*, https://www.ncbi.nlm.nih.gov/books/NBK556149/). It is unclear what the court is meant to do with this paper given the scope of review on appeal, particularly given Dr. Shubair's own characterization of "mild impairment in the diffusion capacity" on the April 8, 2021 pulmonary function test (tr. 377).

[7] By contrast, some of Rigsbee's own record citations appear cherrypicked. For example, Rigsbee points to an emergency room visit where he reported wheezing, but this was due to an allergic reaction to washing a dog. (Doc. 13 at 10) (citing tr. 458). Rigsbee also cites another emergency room visit for abnormal breath noises, but this was due to an upper respiratory infection. (*Id.* at 12) (citing Tr. 602). And while Rigsbee showed shortness of breath and rhonchi with forced expiration at a visit to Dr. Edwin Keel on January 18, 2022, (*id.*) (citing tr. 426), Rigsbee also tested positive for COVID-19 at this visit (tr. 426). None of these appear to have anything to do with Rigsbee's COPD-related limitations under normal circumstances.

periodically complained of breathing problems even when examination reflected normal breathing sounds. (*See, e.g.,* tr. 447, 511). But the ALJ contrasted Dr. Shubair's opinion with objective findings, not Rigsbee's subjective complaints. And even to the extent that evidence in the record conflicts, it is the ALJ's duty to resolve those conflicts. The court does not "reweigh the evidence or substitute [its] own judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004). The ALJ's citations to the record reflecting normal breath sounds are substantial evidence to support her conclusion, notwithstanding that other evidence in the record might support abnormal breath sounds on other occasions.

The ALJ also relied on "consistently good oxygen saturation" upon examination. (Tr. 33). Rigsbee contends this was not substantial evidence because those findings were made at rest in a doctor's office, while there is evidence to support deoxygenation outside the doctor's office. (Doc. 13 at 26). For example, Rigsbee points to a sleep study where his oxygen saturation dropped to 88%. (*Id.*) (citing tr. 493). But this was due to obstructive sleep apnea, not exertion. (Tr. 493). It is unclear why the ALJ would have been required to find that low oxygen saturation due to sleep apnea would result in work-related limitations. Rigsbee also states that there is no medical opinion evidence to support that high oxygen saturation on examination is inconsistent with Rigsbee's CT scans showing emphysema. (Doc. 13 at 26–27). But the ALJ's job is to reconcile conflicting evidence, and high oxygen saturation on examination is clearly at least a data point in favor of adequate respiratory function. It is not "playing doctor" to note the inconsistency between this data point and the limitations imposed in the medical opinions.

Added to the pulmonary function test, Rigsbee's generally normal examination findings are enough evidence for a reasonable person to find that opinions that Rigsbee cannot tolerate any

work activities are inconsistent with and unsupported by the evidence.  Thus, the ALJ's decision

to find Dr. Shubair's opinion only partially persuasive was supported by substantial evidence.

### 2. CRNP Foster

At the direction of the Social Security Administration, CRNP Foster performed a

consultative examination of Rigsbee on January 15, 2022. (Tr.  33, 520–26).  CRNP Foster found

that Rigsbee was well groomed, alert, co-operative, responded adequately to questions and

commands, and maintained eye contact.  (Tr. 521).  She also noted that Rigsbee's breath sounds

were normal with good air movement.  (*Id.*).  Furthermore, CRNP Foster found that Rigsbee had

no trouble getting on and off the examination table, walking on his heels, or squatting.  (Tr. 522,

524).  She opined that Rigsbee could sit or stand occasionally throughout the work day and could

not lift or carry anything due to shortness of breath.  (Tr. 525).

The ALJ rejected CRNP Foster's opinion for substantially the same reasons that she found

Dr. Shubair's opinion unpersuasive.  (Tr. 34).  Specifically, the ALJ found the restriction on lifting

and carrying inconsistent with CRNP Foster's "largely normal examination findings," the

pulmonary function test, Rigsbee's normal breath sounds, and his oxygen saturation levels. (*Id.*).

For the same reasons that the ALJ appropriately discounted Dr. Shubair's opinion, her

decision to find CRNP Foster's opinion unpersuasive was supported by substantial evidence.

Additionally, the ALJ noted that CRNP Foster's own "largely normal" examination findings did

not support her opinion.  (Tr. 34).  The ALJ was entitled to reject an unsupported opinion

inconsistent with other evidence in the record.

## C. The ALJ Appropriately Incorporated Rigsbee's Mental Limitations Into the RFC

Rigsbee also contends that the RFC failed to incorporate the effects of his severe panic disorder into the RFC. (Doc. 13 at 27–28). Rigsbee relies primarily on his own subjective reports to show limitations related to panic disorder. (Doc. 13 at 27). Specifically, he says that he has anxiety "more days than not," gets nervous "walking into Wal-Mart," has "frequent panic attacks" going to the grocery store or gas station, begins hyperventilating when he smells someone else's perfume or body odor, and has panic attacks an average of three to four times a week (but sometimes up to six per day). (*Id.*) (citing tr. 30, 55, 63–64, 74, 567, 642). Rigsbee states that he experiences "shortness of breath, heart palpitations, becomes tremulous, and [has] a sense of impending doom" due to these panic attacks, causing him to have to leave places and go home immediately. (*Id.*) (citing tr. 567, 575, 642). Rigsbee argues the ALJ did not incorporate limitations related to the symptoms he described into the RFC. (*Id.*).

The ALJ assessed Rigsbee's panic disorder symptoms in multiple places in the record. First, the ALJ analyzed Rigsbee's mental function by way of the "paragraph B" criteria:[8] activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. As it pertains to panic disorder, the ALJ found that Rigsbee had a moderate limitation when it came to interacting with others. (Tr. 30). The ALJ noted Rigsbee's testimony that he had panic attacks when he was around others, became anxious in crowds of more than three, did not get along with others, and mental health experts stated he was anxious. (*Id.*).

---

[8] The paragraph B criteria are used to assess whether a mental impairment meets or medically equals a listing. Here, the ALJ considered whether Rigsbee met Listing 12.04 (depressive, bipolar, and related disorders) or Listing 12.06 (anxiety and obsessive-compulsive disorders). (Tr. 29–31); 20 C.F.R. § 404.00, Subpart P, Appendix 1, Listings 12.04 & 12.06.

However, consultative examiner Dr. Scott Duncan and CRNP Foster both noted Rigsbee appeared happy and pleasant, with CRNP Foster noting that Rigsbee made good eye contact. (Tr. 30, 518, 521). As for concentrating, persisting, and maintaining pace, the ALJ found that Rigsbee had a mild limitation. (Tr. 30). While Rigsbee testified he had trouble maintaining focus, both Dr. Duncan and Foster noted he had a normal attention span and had no trouble responding to questions. (Tr. 30, 518, 521). Thus, the ALJ found that Rigsbee could concentrate in two hour intervals. The ALJ also found that Rigsbee experienced a mild limitation as to managing himself. (Tr. 30). Despite Rigsbee's testimony concerning panic attacks, the ALJ found that Rigsbee was "universally" described as adequately dressed and groomed with intact judgment and insight. (Tr. 30, 518, 561, 563–64, 569, 571, 605).

Second, the ALJ explicitly assessed Rigsbee's subjective complaints concerning the limitations imposed by his panic disorder. (Tr. 35). The ALJ found that Rigsbee's statements concerning "the intensity, persistence, and limiting effects of his symptoms" were "inconsistent with the evidence." (*Id.*). Specifically, the ALJ noted that despite his claims of frequent panic attacks, Rigsbee reported to a provider on October 18, 2022, that he had not taken Xanax for panic episodes in three months. (Tr. 35, 576). The ALJ also cited Rigsbee's testimony that he only took Xanax three or four times per week. (Tr. 35, 62–62). And the ALJ noted that Rigsbee's self-reported activities of daily living—driving, shopping, and fishing—were not affected by his panic attacks. (Tr. 35, 305, 308, 516).

After considering the evidence above, the ALJ imposed the following mental limitations in the RFC: "he can perform work with occasional interaction and cooperation with coworkers and supervisors; and he can maintain concentration, persistence, or pace to complete work in two-hour intervals for an eight-hour day." (Tr. 31). While Rigsbee contends that this fails to take into

account the symptoms he reported, his argument relies on accepting those symptoms at face value. But the ALJ did not do that.  Instead, as discussed above, she found Rigsbee's reported symptoms inconsistent with evidence in the record.  Rigsbee does not directly challenge this credibility determination.  Since the ALJ did not accept Rigsbee's reported symptoms as entirely indicative of the limitations caused by his panic disorder, Rigsbee cannot fault the ALJ for failing to impose limitations based on those symptoms.

### D. The Appeals Council Did Not Err by Denying Review of Additional Evidence

Rigsbee states that the appeals council erred when it denied reviewing any additional evidence. (Doc. 13 pg. 36). "With a few exceptions, the claimant is allowed to present new evidence at each stage of [the] administrative process," including before the Appeals Council. *Ingram v. Comm'r of SSA*, 496 F.3d 1253,1261 (11th Cir. 2007).  The Appeals Council must review a case if it receives additional evidence that is new, material and chronologically relevant. 20 C.F.R. § 404.970(a)(5); *Ingram*, 496 F.3d at 1261.  "[W]hether evidence meets the new, material, and chronologically relevant standard is a question of law subject to . . . *de novo* review," and an erroneous failure to consider such evidence warrants remand.  *Washington v. Soc. Sec. Admin., Com'r*, 806 F.3d 1317, 1321 (11th Cir. 2015). New evidence is noncumulative evidence that was not previously presented to the ALJ, and that evidence is material when "there is a reasonable possibility that the new evidence would change the administrative outcome." *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987).  Evidence is chronologically relevant if "it relates to the period on or before the date of the [ALJ] hearing decision." *Foster v. Colvin*, No. 12-CV-4038-VEH, 2014 WL 1338095, at *4 (N.D. Ala. Mar 28, 2014) (citing 20 C.F.R. § 404.970(b)). Even records that postdate the ALJ's decision may be chronologically relevant when they assess

16

conditions that existed prior to the decision and there is no evidence of deterioration. *Washington*, 806 F.3d at 1322.

Rigsbee submitted three additional pieces of evidence he now says should have been accepted by the Appeals Council: (1) a third opinion from Dr. Shubair (tr. 633–37); (2) an opinion and evaluation by clinical psychologist Dr. June Nichols (tr. 638–46); and (3) an examination and opinion by Dr. Janie Teschner (tr. 647–50).[9]  (Tr. 6)

### 1. Dr. Shubair's Third Opinion

Rigsbee submitted a third opinion from Dr. Shubair, dated April 5, 2022. (Tr. 633–35).  Dr. Shubair's opinion was dated during the relevant period and is thus chronologically relevant.  20 C.F.R. § 404.970(a)(5).  However, the Appeals Council declined to consider it, finding it was not material that there was not a reasonable possibility that it would change the outcome of the case. (Tr. at 6).

Dr. Shubair's opinion stated that Rigsbee has extensive emphysema, shortness of breath, and could not lift more than ten pounds.  (Tr. 633–35).  As discussed above, Dr. Shubair's first two opinions state Rigsbee had extensive emphysema, could not lift more than five pounds, and had tightness in his chest.  Dr. Shubair's third opinion is extremely similar to his first two, so it is largely cumulative of them.  To the extent that it is not, Dr. Shubair's third opinion actually imposes a *less* restrictive lifting restriction than the prior opinions the ALJ found not entirely persuasive.  Accordingly, the Appeals Council was entitled to find that there was not a reasonable

---

[9] Rigsbee also contends that the Appeals Council failed to consider other evidence he submitted.  (Doc. 13 at 36–38).  However, Rigsbee does not explain anything about what he contends the Appeals Council was required to do with this evidence (which consists of treatment notes postdating the relevant period), and he acknowledges that the evidence was exhibited.  (*Id.* at 36).

probability that Dr. Shubair's third opinion would change the outcome of the case. Thus, the Appeals Council did not err by declining to consider it.

### 2. Drs. Nichols and Teschner

The Appeals Council declined to consider the opinions of Dr. Nichols and Dr. Teschner because they were not chronologically relevant. Both Dr. Nichols and Dr. Teschner evaluated Rigsbee after the ALJ's May 15, 2023, determination.

Dr. Nichols' evaluation was dated August 1, 2023. (Tr. 638). She opined that Rigsbee could not follow a schedule, follow ordinary routines, interact with co-workers, maintain socially appropriate behavior, adhere to basic standards of cleanliness, and would be off task 40% of an 8 hour workday. (Tr. 645). Dr. Teschner's opinion was similar to that of Dr. Nichols. Dr. Teschner examined Rigsbee on September 19, 2023. She stated that Rigsbee had severe COPD, shortness of breath, panic attacks, could not sit or stand for more than 30 minutes at a time, needs to lay down 5 out of the 8 hours of a workday, would be off task 50% of the time, and would miss 30 days of work monthly. (Tr. 647–50).

Neither doctor conducted their evaluation during the relevant period. Neither doctor provided any explanation for *how* the limitations they imposed related back to the period in question. Dr. Nichols merely summarized the medical record and checked a box indicating that the limitations dated back to April 15, 2021. (Tr. 642–46). Dr. Teschner simply stated that she had "reviewed" the medical records and checked a similar box. (Tr. 647, 650). Neither physician explained how their evaluation related to Rigsbee's previous medical history or his symptoms during the relevant time period. *Cf. Washington v. Soc. Sec. Admin., Com'r*, 806 F.3d 1317, 1323 (11th Cir. 2015) (concluding under "the specific circumstances" of the case that evaluation conducted after the relevant time period was chronologically relevant where the claimant described

his symptoms during the time period, the evaluating physician had reviewed medical records, and there was no sign of deterioration). Accordingly, the Appeals Council did not err in declining to review the opinions.

## VI. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, the decision of the Commissioner of Social Security denying Rigsbee's claim for period of disability and disability insurance benefits is **AFFIRMED**.

DONE this 30th day of September, 2025.

 

**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE